UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:06-CR-36 |
| | ) | |
| ALPHONSO K. PETWAY, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter comes before the Court upon Defendant's Motion to Suppress [Doc. 18], which was filed on July 19, 2006. The motion was referred to the undersigned pursuant to the standing order of the Court and 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Judge as may be appropriate. The parties came before the Court for a suppression hearing on September 20, 2006. The government was represented by Assistant United States Attorney Caryn L. Hebets. The defendant, Alphonso K. Petway, Jr., ("Defendant") was represented by Tim S. Moore. Defendant was also present. At the conclusion of the hearing, the Court took the motion and related filings under advisement.

Defendant is charged in a one-count Indictment [Doc. 7] alleging that on June 23, 2006, Defendant possessed with intent to distribute fifty grams or more of cocaine base. Defendant argues that he was unlawfully stopped and seized in violation of his Fourth Amendment rights on June 23, 2006, and that the subsequent search of his vehicle and person was therefore unconstitutional. [Doc. 18]. The government filed an opposition to Defendant's motion, arguing that

the officers performed a lawful <u>Terry</u> stop of Defendant, discovered illegal drugs during a pat-down of Defendant's shirt, arrested Defendant, and that additional evidence, more drugs, obtained incident to that arrest was lawfully obtained. [Doc. 19].

## I.  SUMMARY OF TESTIMONY

### A.  <u>Testimony of Investigator Laddie Brian Rice</u>

At the suppression hearing, Defendant's first witness was Investigator Laddie Brian Rice ("Rice") of the Johnson City Police Department ("JCPD").  Rice testified that in June, 2006, he was a Criminal Investigation Sergeant with the JCPD.  He testified that he had been a detective since January, 1999, and had been with the JCPD for eleven years.  Rice later noted that he had also served as a police officer in another jurisdiction for five years prior to coming to the JCPD, and had been a police officer for a total of sixteen years.  Rice indicated that he investigates a wide range of felony offenses, including theft, narcotics, and homicides.  Rice stated that while some detectives focus on a specific area, he does not.

Rice testified that he was on duty on the evening of Friday, June 23, 2006, and that he and three other detectives,  Deborah Dunn ("Dunn"), Billy Church ("Church"), and John Sipos ("Sipos") had just finished eating dinner at around 8:00 p.m. at Wok and Hibachi.  Rice indicated that Wok and Hibachi is approximately one and a half miles southeast of the Johnson City Mall ("Mall").  Rice noted that all four detectives were riding in the same vehicle, an unmarked light grey SUV, with Rice driving. Rice testified that Dunn specialized in child sexual abuse cases, Church specialized in white collar crimes, and Sipos specialized in robbery and assault.  Rice also testified that, while the detectives might specialize in specific areas, they still handled all types of cases.  Rice said that none of the four detectives specialized in narcotics crimes.

Rice said that, as he and Dunn, Church, and Sipos were getting into their vehicle after eating dinner, they heard a report over the police radio[1] indicating that the driver of a black or dark SUV was allegedly waiving a gun out the window of his vehicle in the parking lot of the Mall. Rice noted that the detectives would not normally respond to that type of call. However, Rice said that since they were so close to the area, and since the report involved a gun in a public area, raising a public safety issue, they responded. Rice testified that he did not remember exactly how long it took them to respond, but that it would have been just a matter of minutes.

Rice said that the initial reports indicated that there were two people in the suspect vehicle. Rice said that he did not recall radio traffic discussing the ethnicity of the driver, but he agreed that knowing the ethnicity of a suspect is important for helping to identify the suspect.

Rice testified that, as they were approaching the area around the Mall, Officer Dougherty[2] ("Dougherty") announced over the radio that he had spotted a dark blue Mercury Mountaineer SUV coming from the direction of the Mall and heading toward the Roane Center, in the direction of the Dollar General and the Electric Cowboy. Rice said that when he arrived at the Roane Center parking lot, he observed two vehicles, one dark blue Mercury Mountaineer and one grey Charger, parked in opposite directions with a concrete median in between them. Rice also said that Defendant had gotten out of the Mountaineer and was leaning into the driver side window of the Charger.

---

[1]A cd-rom containing a copy of all of the police radio traffic relating to the events in question was entered into the record as Defense Exhibit 3. The Court summarizes each section of the 911 recording as each recording is played. Additionally, a summary in chronological order of all of the recordings on Defense Exhibit 3 is included as Appendix A.

[2]Officer Dougherty was off-duty at the time and was serving as a security officer for the movie theater located near the Mall.

Defense counsel played a portion of the 911 tape with a time stamp of 20:03:41.[3] [Def. Ex. 3]. Rice stated that, as he arrived at Roane Center and saw Defendant, he announced over the radio that he was going to watch for a minute. Rice testified that it was at that point that Dougherty announced over the radio that Rice was watching the Mountaineer that Dougherty had earlier identified. Rice said that he did not observe any sign of a gun while he was watching the interaction between Defendant and the Charger. Rice testified that he asked Dougherty over the radio if Dougherty had witnessed anything, but Dougherty reported that he had not.

According to Rice, the Charger then left, and Defendant got back into his vehicle and began to back out. Rice pointed out his location on an aerial photo of the area [Def. Ex. 1] and indicated that he was located across the parking lot from Defendant, and that, because of the layout of the parking lot, there was not a direct path between Rice's initial location and that of Defendant. Rice said that he drove up behind Defendant as Defendant was backing out. Rice testified that he activated his emergency equipment as he pulled in behind Defendant.

Rice testified that he was not certain what direction the Charger took or whether it left in a hurry, because he was focusing his attention on Defendant's vehicle, which matched the description of the suspect vehicle. Rice said that, upon making the stop of Defendant, the detectives were still investigating a report of a gun, not a narcotics crime. Rice stated that, while it was possible that the exchange between Defendant and the occupant(s) of the Charger might have been

_____

[3]The recording at time stamp 20:03:41 is of police radio traffic between Dispatch, Rice, and Dougherty. In the recording, Rice said that he saw a dark blue Mercury Mountaineer near the Electric Cowboy and that a black male was outside of the vehicle talking. Rice said he was going to watch for a minute. Dougherty then reported that he could see Defendant getting back in his vehicle and confirmed that was the vehicle Dougherty had spotted earlier. Dougherty said that he had not seen anything suspicious, but had heard the report on the radio and seen the vehicle drive by the theater.

drug related, at that point in time he did not suspect drug activity and was still investigating a report of a gun.

Rice testified that he pulled his vehicle up at an angle to Defendant's driver's side door. Rice further testified that, after stopping, the detectives got out of Rice's vehicle with their guns drawn and asked Defendant to get out of his vehicle. Rice said that no other officers were on the scene when the detectives stopped Defendant, but that uniformed officers arrived less than a minute thereafter.

Rice testified that, after Defendant exited his vehicle, Rice did a very quick pat-down of Defendant's waist and pant pockets area, looking for a gun. Rice said that he did not feel or see a gun, but did feel a large wad of what Rice believed to be cash in Defendant's front pants pocket. Rice stated that, since his quick pat-down had not revealed a gun, he handed Defendant over to Sipos. Rice said that Sipos then handcuffed Defendant for officer security and performed a more thorough pat-down of Defendant. Rice said that the pat-down by Sipos also did not reveal a gun. Rice described his position acting in a supervisory role over Dunn, Church, and Sipos.

Rice testified that he then looked at the driver's seat area of Defendant's vehicle to see if a gun was visible, but failed to locate one. Rice then went back to Defendant, removed the cash from Defendant's pocket, and asked Defendant if he had been to the Mall.

Rice said that, while he was talking to Defendant, other officers were searching Defendant's vehicle for a gun, but a gun was never found. Rice testified that, when the officers failed to find a gun, he sent an officer over to the Mall to locate the initial complainant so that the complainant could tell the officers whether Defendant was the person the complainant had observed waiving a gun. Rice testified that it was at this point that he began to wonder if Defendant had

passed the gun over to the Charger. However, Rice stated that he did not put out an APB for the Charger or otherwise take any action to locate the Charger.

Rice said that he had also begun, by that point, to wonder if the Defendant's contact with the Charger was a drug transaction, so he began to question Defendant. Rice stated that Defendant had not been read his Miranda rights at this point in time. Rice testified that he asked Defendant his name and whether Defendant was employed. Rice testified that Defendant said that he was not employed. Rice observed that Defendant's vehicle still had a temporary drive out tag, and he concluded that it was a recently purchased vehicle.

Rice stated that Defendant had seemed calm, cooperative, and relaxed at the beginning of the investigation. However, Rice said that, as the focus of the investigation shifted from Defendant's car to Defendant, Defendant appeared nervous and began to sweat profusely. Rice said that on the evening of June 23, 2006, the temperature was warm, but, in his opinion, Defendant was sweating an unusual amount: "like someone poured a bucket of water over his head." Rice said that in his sixteen years of police work he had never seen anyone sweat so profusely. Rice testified that the fact that Defendant had a large wad of cash, was driving a recently purchased, but not "new," vehicle when he was unemployed, and was sweating profusely increased his suspicions that he might have observed a drug deal between Defendant and the occupant(s) of the Charger.

Rice said that it was at this point that he observed a piece of tissue paper sticking out of one of Defendant's shirt pockets. Rice stated that, based upon his experience and training as a police officer, he believed that the tissue paper contained a controlled substance, so he pulled the tissue paper out of Defendant's pocket, opened it up, and discovered a small quantity of what he believed to be crack cocaine. Rice testified that Sipos then placed Defendant under arrest and

performed a search incident to arrest, revealing a large patty of cocaine in Defendant's other shirt pocket.[4]

Rice reiterated that he could not tell what was happening in the encounter between Defendant and the occupant(s) of the Charger. Rice again noted that he was focusing on the dark SUV, the Mercury Mountaineer, as that was the vehicle suspected of being involved with the report of a gun. Rice stated that the area around the Mall is not a high crime area, and that drug transactions are more common to other areas of Johnson City, but that drug transactions do occur in parking lots all over the city, including the Mall.

Rice testified that he remembered radio reports that the dark SUV associated with the gun report had left the rear parking lot of the Mall and was heading towards the connector road which leads to the theater and the Roane Center parking lot. Rice was shown a picture of the Roane Center parking lot, looking toward the theater, and Rice agreed that the picture was a fairly accurate representation of the area where Defendant was parked on the night in question. [Def. Ex. 2].

On cross-examination, Rice confirmed that he had worked a total of 16 years as a police officer and had received training in both general investigation and narcotics investigation. Rice said that he has made arrests on drug related crimes, but has never been an undercover narcotics officer. Rice stated that he supervises the five narcotics officers in his division, and that he has investigated hundreds of drug crimes.

Rice reiterated that it only took two or three minutes for the detectives to arrive at the Roane Center parking lot from Wok and Hibachi. Rice said that, as he was pulling into the Roane

---

[4]A picture of both quantities of cocaine was later admitted into evidence as Government's Exhibit 4. [Gov. Ex. 4].

Center parking lot, he was looking for a dark colored SUV. Rice further testified that, because of Dougherty's radio transmissions, the detectives were specifically looking for a dark blue Mercury Mountaineer SUV. Rice stated that he was looking for the Mercury Mountaineer because of the report of someone in a dark SUV waving a gun. Rice noted that, if not for the report of a gun, the interaction between Defendant and the occupant(s) of the Charger would not have been unusual.

Rice then testified that the person on whom the drugs in question were found was in attendance at the hearing, and he then identified Defendant. Rice again stated that the detectives did not make any other stops as they drove to the Roane Center parking lot, and that it would have been no more than five minutes between the time they heard the first radio report and when they stopped Defendant.

Rice testified that, because of the report of a gun, Defendant had been handcuffed for officer safety. Rice confirmed that no gun was ever found, and that the officer who had been sent to find the original complainant was unable to locate the complainant. Rice testified that there were other places the gun could have gone, such as with the occupant(s) of the Charger, so that the absence of a gun was not conclusive as to whether Defendant was the proper suspect on the gun report. Rice said that he was not sure whether Defendant was or was not the person reported in the 911 call as waving a gun.

Rice reiterated that, based upon his training and experience as a police officer, he believed that the tissue he saw sticking out of Defendant's shirt pocket contained narcotics. Rice confirmed that the tissue did contain a small quantity of cocaine, and that Defendant had a four inch patty of cocaine in a small plastic bag in his other shirt pocket. Rice again testified that, at the

beginning of the stop, Defendant was calm, quiet, and compliant, but that, as the investigation progressed, Defendant became increasingly nervous, fidgety, and began to sweat profusely.

On redirect examination, Rice confirmed that Defendant is an African American. Rice said that he did not know who had made the original 911 call, and he did not know where the complainant was. Rice agreed that Dougherty had stated that he had not seen any illegal activity on the part of Defendant, and that Dougherty had not seen Defendant talking to the occupant(s) of the Charger. Rice said that he did not know how many dark colored SUVs were in the vicinity of the Mall on the evening of June 23, 2006, that dark colored SUVs were a common sight in the area, and that he did not know what Defendant and the occupant(s) of the Charger were doing. Rice stated that there were no signs of an altercation between Defendant and the occupant(s) of the Charger. Rice said again that he found the small package of cocaine before finding the larger patty of cocaine. Finally, defense counsel played a portion of the 911 tape with a time stamp of 20:12:33[5] [Def. Ex. 3], but Rice testified that he did not remember that broadcast.

## B. Investigator John Sipos

Defendant next called John Sipos, an Investigator with the JCPD. Sipos testified that has been a detective for between four and a half to five years. Sipos said that he was with Rice, Church, and Dunn on the evening of June 23, 2006, and that they had just finished eating dinner at Wok and Hibachi at around 8:00 p.m.

---

[5]The recording at time stamp 20:12:33 is of police radio traffic between Dispatch and an unidentified police officer. Dispatcher advised the officer that there had been a sighting of a black Rodeo SUV by Mall Security and that the SUV might be the one from the original gun report. The Rodeo was last seen going towards Roane Street and contained two white males and one white female.

Sipos stated that, as they were leaving Wok and Hibachi, they heard a broadcast over the radio of a report of a man waving a gun out of the window of a dark SUV in the Mall parking lot. Sipos said that he could not remember whether the initial call identified the ethnicity of the suspect, but he did remember that the topic was discussed over the radio. Sipos stated that Dougherty radioed in from the theater near the Mall, asking whether the suspect was black or white because Dougherty had seen a black male drive by in a dark SUV from the direction of the Mall.

Sipos testified that he was riding in the rear passenger side seat, that Rice was driving, and that Church was in the front passenger seat. Sipos said that they drove to an area near where Defendant was last spotted so that they could surveil the vehicle and determine whether it was the vehicle involved in the gun report. Sipos noted that, as they arrived at the Roane Center parking lot, Defendant was standing next to a grey Charger, leaning into the driver's side window. Sipos testified that, other than the dark SUV which might be involved in the gun report, he did not see anything suspicious in the encounter between Defendant and the occupant(s) of the Charger. Sipos confirmed that he did not see a gun, nor was there any sign of agitation, nor any indication that a confrontation involving a gun was occurring between Defendant and the occupant(s) of the Charger. Rice testified that, at the time, he did not suspect a drug transaction was occurring between Defendant and the occupant(s) of the Charger.

Sipos explained that, because of the layout of the parking lot, Rice had to drive around the parking lot to get to Defendant. Sipos noted that Defendant was backing out to leave by the time the detectives pulled up behind him, so Rice activated his emergency equipment. Sipos confirmed that Rice did broadcast over the radio that the detectives were going to watch Defendant

for a minute, but that broadcast was made before Defendant was in motion. Sipos did not recall whether Dougherty indicated whether or not Dougherty had seen anything suspicious.

Sipos noted that he had his gun drawn as he was exiting Rice's vehicle. Sipos said that Defendant did not struggle or try to escape. Sipos testified that he handcuffed Defendant and that Defendant was standing next to Rice's vehicle, some ten to fifteen feet away from Defendant's vehicle. Sipos said that he then performed a quick pat-down of Defendant to locate any obvious weapons. Sipos stated that he performed a quick pat-down, because the detectives had control of Defendant, so he did not feel that a full pat-down was necessary. Sipos said that he performed his pat-down of Defendant before Rice searched Defendant, and that Dunn and Church searched Defendant's vehicle after Rice performed the pat-down.

Sipos stated that Dunn and Church did not find a gun when they searched Defendant's vehicle, so Rice turned his attention back to Defendant. Sipos said that Rice was standing in front of Defendant and Sipos was standing behind Defendant. Sipos testified that Rice was talking to Defendant and that Rice then found a baggie containing cocaine, at which point Sipos arrested Defendant and performed a search incident to arrest. Sipos stated that he was standing behind Defendant, so Sipos did not know if Rice first found a tissue containing cocaine.

Sipos said that the grey Charger did not leave the area in an "abrupt" manner, but it did leave. Sipos testified that the detectives did not put out an APB for the Charger, or otherwise try to locate it. Sipos testified that Officers Jenkins, Dougherty, and Hammer were also on the scene. Sipos said that Dougherty was in uniform, but Sipos did not know whether Dougherty was on duty or not.

On cross-examination, Sipos testified that he had been a police officer for nine and a half years and does have training and experience with narcotics investigations. Sipos said that he had been involved with approximately three or four dozen narcotics investigations.

Sipos noted that, after Rice found the small quantity of cocaine, Sipos verified that Defendant's hand-cuffs were secure and then performed a search incident to arrest, revealing a large patty of cocaine. Government counsel showed Sipos a picture of two quantities of cocaine [Gov. Ex. 4], and Sipos indicated that Rice found the small piece of cocaine and Sipos found the larger piece. Sipos agreed that the picture showed that the smaller piece of cocaine was wrapped in a piece of tissue, but Sipos noted that Rice handled that piece of evidence, not Sipos.

Sipos testified that Defendant was calm and compliant when the detectives first stopped him, but he became increasingly nervous and jittery, and then started to sweat profusely, in excess of what you would expect for a hot summer day. Sipos verified that the detectives came to the Roane Center parking lot looking for a dark blue Mercury Mountaineer, and that they found it located near the Dollar General and the Electric Cowboy.

Sipos said that it probably took them about three minutes to get from Wok and Hibachi to the Roane Center parking lot. Sipos confirmed that Defendant was outside his vehicle, next to the Charger, when the detectives arrived on the scene. Sipos said that he focused his attention on the Mountaineer, watching for any signs of a gun, and that Rice handled the radio, so Sipos was not paying that much attention to the radio. Sipos stated that he did not know if any other vehicles were stopped in relation to the gun report.

On redirect examination, defense counsel played a portion of the 911 tape with a time stamp of 20:12:33[6] [Def. Ex. 3], but Sipos testified that he did not remember hearing that broadcast. Sipos said that he did have a personal radio with him while investigating Defendant. Sipos confirmed that Defendant had been placed near Rice's vehicle, and that the vehicle was warm, but that Defendant was sweating far more profusely than standing next to a warm vehicle would explain. Sipos stated that he had not discussed whether or not Defendant had been sweating with anyone else prior to the hearing.

## C.    Investigator Billy Church

Defendant next called Billy Church, an Investigator with the JCPD. Church said that he had been a detective with the JCPD for about seven years. Church noted that he primarily handles white collar crime, but also deals with other types of crimes.

Church testified that on the evening of June 23, 2006, he had gone to eat with Rice, Sipos, and Dunn at Wok and Hibachi. Church said that, as they were leaving the restaurant, the detectives heard a report of a man in an SUV near the Mall with a gun. Church stated that Rice decided they should investigate, since they were nearby. Church noted that he did not recall any discussion about how many people were in the vehicle, the ethnicity of the driver, or who was waving the gun, only that it was a dark SUV and a gun was involved.

Church said that he was in the front passenger seat, and that the detectives drove from Wok and Hibachi to the Roane Center parking lot, near the Mall. Church stated that they stopped

---

[6]The recording at time stamp 20:12:33 is of police radio traffic between Dispatch and an unidentified police officer. Dispatch advised the officer that there had been a sighting of a black Rodeo SUV by Mall Security and that the SUV might be the one from the original gun report. The Rodeo was last seen going towards Roane Street and contained two white males and one white female.

at the intersection in front of the Roane Center parking lot and then pulled through into the parking lot and saw a dark SUV.  Church said that at that point Dougherty confirmed over the radio that the detectives were looking at the vehicle Dougherty had spotted.  Church testified that Defendant was outside his vehicle, leaning into another vehicle and talking when the detectives arrived.  Church stated that Defendant then returned to his vehicle and was preparing to leave when the detectives pulled up behind him.

Church stated that he did not recall telling anyone that the other vehicle left in an abrupt manner.  Church confirmed that he did not see a gun or anything that indicated a drug transaction was occurring between Defendant and the occupant(s) of the other vehicle.  Church noted that he did not have his gun drawn when they stopped Defendant, but he did have his hand on his gun.

Church testified that Defendant cooperated with the detectives and didn't try to run away.  Church stated that Defendant seemed very nervous.  Church said that Rice and Sipos performed the initial pat-down and did not find a gun.  Church stated that he then searched the front driver area of the car, including the areas within the reach of the driver, and that other officers searched the rest of the car, but no gun was found.

## D.      Investigator Deborah Carrie Dunn

Defendant next called Deborah Carrie Dunn, an Investigator with the JCPD.  Dunn testified that she had been a detective with the JCPD for about three years, and had been working on child sex abuse cases for the past four or five months.  Dunn noted that she had gone out to eat with Rice, Sipos, and Church on the evening of June 23, 2006, and that they heard a report of a man in an SUV waving a gun as they were leaving the restaurant.  Dunn said that she did not know at the

time of the complaint that the complainant had left the Mall after making the complaint and did not know if any other vehicles were stopped in conjunction with the gun report.

Dunn testified that she was sitting in the back drivers side of Rice's vehicle. Dunn stated that, upon arriving at the Roane Center parking lot, she saw Defendant leaning into the driver's side window of another vehicle. Dunn said that Dougherty had announced over the radio that he had seen a dark SUV heading in the direction of the Roane Center parking lot. Dunn confirmed that, other than the dark SUV, which matched the description of the vehicle in the gun report, she did not see anything suspicious or any sort of confrontation between Defendant and the occupant(s) of the other vehicle. Dunn stated that she thought that the initial report indicated that a black male had been waving a gun, and she did not remember there being any question about the number of people in the reported vehicle. Dunn testified that she did not tell anyone that she thought that the encounter between Defendant and the occupant(s) of the other vehicle was a drug transaction. From her perspective, the officers were just investigating a report of a man with a gun.

Dunn stated that the detectives stopped Defendant, one of the detectives removed Defendant from his vehicle, handcuffed Defendant, and placed Defendant in front of Rice's vehicle. Dunn noted that she stayed back to watch the perimeter, as there were several officers around Defendant's vehicle. Dunn testified that the next thing she knew, a "cookie" of cocaine was being placed on the hood of Defendant's vehicle. Dunn confirmed that no gun was found. Dunn said that she could not remember whether the cocaine was found before or after the car was searched. Dunn also said that she was focusing on the dark SUV, so she could not remember if the other vehicle left in an abrupt manner.

**E.     Officer Eric Dougherty**

Defendant next called Eric Dougherty, a K9 officer with the JCPD.  Dougherty testified that he is the officer in charge of the "power shift," the overlap shift between days and nights.  Dougherty stated that, on the evening of June 23, 2006, he was off-duty and was working as a security guard for the AMC theater near the Mall, standing in the back of the ticket counter, looking out into the parking lot of the theater.  Dougherty said that Friday nights can be very busy at the theater.

Defense counsel played a portion of the 911 tape with a time stamp of 19:58:19[7] [Def. Ex. 3] and Dougherty said that he was the one who had asked whether the individual waving the gun was a black male.  Dougherty said that he made his inquiry right after the report of the man with a gun went out, and that he did so because he had just seen a dark SUV drive by the front of the theater.  Dougherty agreed that it could have just been someone dropping someone else off at the theater.  Dougherty was then shown a picture of the parking lots of the theater and the Roane Center. [Def. Ex. 2].  Dougherty said that there is a  road off the right side of the picture, and that he saw the SUV drive from left to right in front of the theater, but did not observe anything suspicious.

---

[7]The recording at time stamp 19:58:19 is of radio traffic between Dispatch and various police officers, including Rice and Dougherty.  Dispatch advises that there has been a report of the driver of a black SUV waving a gun in the Mall parking lot driving towards the front of the Mall on the JC Penney side.  Dougherty asks if the driver is a black male, but Dispatch indicates that they are checking.

Defense counsel then played a portion of the 911 tape with a time stamp of 20:03:41[8] [Def. Ex. 3] and Dougherty said that the tape indicated that Rice was arriving on the scene. Dougherty noted that the theater ticket counter is in the center of the building, behind the tree in Defendant's Exhibit 2. Dougherty stated that he saw Defendant drive by, but that he lost sight of Defendant's vehicle after that. Dougherty said that he did not see Defendant park, nor did he see Defendant talking to the occupant(s) of another vehicle. Dougherty noted that he only saw one person in Defendant's vehicle and did not see a gun.

Dougherty testified that his attention was initially drawn to Defendant because Defendant was driving by the theater slowly, turning his head as if looking for someone. Dougherty testified that all of the movies had started,[9] so there was no one standing around outside. Dougherty felt that it was unusual for Defendant to be looking for someone when there wasn't anyone out there, so Dougherty was concerned that Defendant might be looking for a vehicle to break into, as the theater has had problems with people breaking into cars in the parking lot. Dougherty testified that people buy tickets from outside the theater, so the ticket office looks directly out into the parking lot.

---

[8]The recording at time stamp 20:03:41 is of police radio traffic between Dispatch, Rice, and Dougherty. In the recording, Rice said that he saw a dark blue Mercury Mountaineer near the Electric Cowboy and that a black male was outside of the vehicle talking. Rice said he was going to watch for a minute. Dougherty then said that he could see Defendant getting back in his vehicle and confirmed that was the vehicle Dougherty had spotted earlier. Dougherty said that he had not seen anything suspicious, but had heard the report on the radio and seen the vehicle drive by the theater.

[9]Defense Counsel introduce a schedule for the movies showing on June 23, 2006, which indicates that there were movies which started at 8:00 and 8:15 that evening. [Def. Ex. 5].

On cross-examination, Dougherty clarified that he had seen Defendant's vehicle twice. Dougherty said that he first saw Defendant's vehicle driving towards the Mall, and that it must have turned left, because he did not see it turn right down Roane Street. Dougherty stated that it is possible to access the back of the Mall by turning left. Dougherty testified that, about ten minutes after he had seen Defendant drive by, Dougherty then heard the initial report of a man in a dark SUV waving a gun in the Mall parking lot. Dougherty noted that, while he was working security, he was in uniform and had his radio.

Dougherty stated that he then inquired as to the ethnicity of the driver, but did not receive a response. Dougherty said that he then saw Defendant drive by the theater again, coming from the direction of the Mall toward the Dollar General. Dougherty said that he had stepped outside by that point and was standing in front of the theater when Defendant went by the second time. Dougherty then announced over the radio that he had seen a dark SUV drive by the theater, but could not remember if he gave a report of what type of SUV he saw, or that the driver was a black male.

Dougherty noted that at that point Rice radioed that he was near by and had seen the dark SUV. Dougherty testified that he had lost sight of the SUV, but confirmed that Rice had seen the same vehicle and driver that Dougherty had seen.

On redirect examination, Dougherty testified that the initial report was of a dark colored SUV. Dougherty noted that he then announced that he had seen a possible matching vehicle near the theater. Dougherty confirmed that he did not see Defendant get out of his vehicle to talk to the occupant(s) of another vehicle.

**F.**      **Pam Denton**

Defendant next called Pam Denton ("Denton"). Denton testified that on June 23, 2006, she was working at Belks in the Mall as a sales associate. Denton testified that on that evening, a customer reported that a man in a black SUV, possibly a Ford Explorer, was waving a gun in the parking lot. Denton stated that the complainant was a younger woman, possibly in her thirties, and that the woman indicated that the gun had not been pointed at her, but that the individual was just waving a gun around.

Denton testified that she was told by the customer that there was more than one person in the vehicle, but that she did not think that the complainant had indicated whether the person waving the gun was black or white. Denton remembered the customer saying, "guys in a black SUV." Denton testified that the customer said "black Explorer," then she said "black SUV." Denton stated that she did not recognize the complainant. Denton noted that she called Kristen Guinn at Belks' security after receiving the complaint. Denton agreed that it was not unusual to see a dark colored SUV in the parking lot.

## G.      Kristen Guinn

Defendant next called Kristen Guinn ("Guinn"). Guinn testified that on June 23, 2006, she was working as a security guard for Belks in the Mall and had been there for about three months. Guinn stated that she did not have any law enforcement background. Guinn testified that a little before 8:00 p.m. she received a call from Denton, indicating that a customer had seen people in a black SUV in the parking lot waving a gun. According to Guinn, Denton may have said, "young kids waving a gun outside of Belks in an SUV." Guinn testified that she then contacted Kenneth Harless with Mall security. Guinn agreed that it was not unusual to see a dark colored SUV around the Mall.

**H.       Kenneth Lee Harless**

Defendant next called Kenneth Lee Harless ("Harless").  Harless said that on June 23, 2006, he was working as a security guard for the Mall.  Harless testified that he was contacted on the evening of June 23, 2006, by Guinn, of Belks' security, about a report of "teenagers" in a dark colored SUV waving a gun in the parking lot.  Harless noted that, at the time, he was driving a Mall security vehicle marked as "Public Safety" and bearing yellow strobe lights.  Harless testified that he saw an SUV coming from JC Penney that matched the description, but that the vehicle would not stop for him.  Harless saw a female passenger in the back seat of the vehicle and another person in the front passenger seat who appeared to be trying to put something under the front seat.

Defense counsel showed Harless a picture of a black Honda SUV [Def. Ex. 6], but Harless did not recognize the vehicle in the picture.  Defense counsel then played two portions of the 911 tape with time stamps of 20:06:04[10] and 20:08:11.[11]  [Def. Ex. 3].  Harless said that he was the caller in the two recordings, and that he had called 911 to report that he had seen a vehicle, a black Rodeo, which he believed to be the vehicle involved in the gun report.  Harless noted that the

---

[10]The recording at time stamp 20:06:04 is of telephone conversation between Harless and a 911 operator.  Harless identified himself as Mall Security and said that he believed he had spotted the vehicle from the gun report.  Harless identified the vehicle as a black Rodeo SUV, stated its license plate number, and noted that the vehicle had turned onto Roane Street.  Harless stated that the vehicle contained two white males and one white female and said that the female kept watching him while he was behind them and that the front passenger was reaching under the seat.

[11]The recording at time stamp 20:08:11 is a continuation of the telephone conversation between Harless and a 911 operator.  Harless said he believed this was the vehicle from the initial gun report, because it had come from the same area in the gun report and fit the description.

license plate number he had reported in the 911 call matched the license plate number shown on the black Honda SUV in Defendant's Exhibit 6.[12]

**I.      Samara Litvack**

Defendant next called Samara Litvack ("Litvack").  Litvack testified that she was in Johnson City on the evening of June 23, 2006, for her sister's birthday.  Litvack said that she owned the black Honda SUV pictured in Defendant's Exhibit 6 and that no one else had been using the vehicle on the evening of June 23, 2006.  Litvack said that she did not believe anyone would drive her vehicle without her knowledge, although her boyfriend did have a set of keys.

**J.      Marsha Hammond**

Defendant next called Marsha Hammond ("Hammond").  Hammond testified that on June 23, 2006, she was the Marketing Director for the Mall and was working at the Mall that evening.  Hammond said that she has been employed by the Mall for five years.  Hammond stated that sometime on June 23, 2006, she was contacted by Harless of Mall Security, who reported a complaint of people in a dark SUV with a gun.  Hammond said that she then called 911.  Hammond said that she did not know how much time had passed from when she received Harless's call and when the original complaint had been made.

---

[12]The Court notes that the black SUV depicted in Defendant's Exhibit 6 is a Honda "CR-V," not a "Rodeo."  The Rodeo model SUV was manufactured by Isuzu, not Honda.

Defense counsel then played five portions of the 911 tape with time stamps of 19:56:40,[13] 19:57:47,[14] 19:58:46,[15] 20:00:17,[16] and 20:01:24.[17] [Def. Ex. 3]. Hammond testified that the recordings were of her conversations with the 911 operator as Hammond described the incident as it had been described to her.

Hammond testified that the Mall parking lots are numbered for ease of reference, but that the numbers used to identify the lots are different from the numbers which are posted in each parking area in the Mall parking lots. Hammond said that the posted numbers are merely there to assist customers in remembering in which area they parked their vehicle, and that the lot numbers

---

[13]The recording at time stamp 19:56:40 is of the first telephone conversation between a 911 operator and Hammond. Hammond identified herself as "Marsha calling from the Mall in Johnson City" and said that a black SUV was waving a gun in the Mall parking lot, somewhere between lot 3 and lot 5, and was heading towards Ruby Tuesday. Hammond stated that the vehicle was at the back of the Mall, by the Belks Women's Store, heading past JC Penney towards Entrance A at the front of the Mall. Hammond states that the report came from Belks Loss Prevention and that a Mall security officer was en route to Entrance A.

[14]The recording at time stamp 19:57:47 appears to be a continuation of the first telephone conversation between a 911 operator and Hammond. Hammond reiterates that the vehicle came from Belks and was heading toward Ruby Tuesday. Hammond states that the driver of the vehicle was waving a gun, and that Belks Loss Prevention actually saw the gun.

[15]The recording at time stamp 19:58:46 appears to be a second telephone conversation between Hammond and a 911 operator. Hammond identified herself as a Marsha Hammond, the Mall's Marketing Director. Hammond stated that she did not know whether the driver was a black male or white male, but that she would find out.

[16]The recording at time stamp 20:00:17 appears to be a continuation of the second telephone conversation between Hammond and a 911 operator. Hammond indicates that the person waving a gun was a black male on the passenger side of a black Ford SUV. Hammond stated that Mall security officers were en route to try to find the suspects.

[17]The recording at time stamp 20:01:24 appears to be a continuation of the second telephone conversation between Hammond and a 911 operator. Hammond indicates that the suspects had left the Mall property, and were possibly heading towards the movie theater. Hammond stated that there were two people in the vehicle and that she did not know whether the driver was a black male or white male.

are used by Mall employees. Hammond stated that there is no visual indication of the lot numbers in the specific lots.

Hammond said that, based upon the report she received, the dark colored SUV was coming from the Belks Women's Store down and around the Mall on the "ring road" towards Ruby Tuesday, which is at Mall Entrance A. Defense counsel showed Hammond a picture taken from Ruby Tuesday facing out into the Mall parking lot. [Def. Ex. 7]. Hammond said that the picture was an accurate depiction of the Mall parking lot and of the usual amount of activity in the Mall parking lot on a Friday evening.

Hammond testified that the movie theater was probably not visible from the Mall, but that you probably could see the road leading to the movie theater. Hammond said that she believed the black SUV was on the ring road going around the Mall. Defense counsel showed Hammond a picture of the Doubletree Hotel taken from the Mall. [Def. Ex. 8]. Hammond agreed that the theater was behind the Doubletree Hotel and was not visible from the Mall.

On cross-examination, Hammond stated that it is possible to drive a vehicle from the back of the Mall to the movie theater. On redirect examination, Hammond confirmed that you would have to pass the Doubletree Hotel to get to the movie theater if you were driving from the back of the Mall.

## II. FINDINGS OF FACT

The Court finds that, at approximately 7:50 p.m. on June 23, 2006, an unidentified young female ("Customer") approached Belks sales associate Pam Denton and informed Denton that there was a black SUV, possibly a Ford Explorer, in the parking lot with multiple occupants and that one of the occupants was waving a gun. Customer said that the vehicle was last seen heading

towards the front of the Mall. Customer did not identify herself to Denton and Customer left the Mall after making the report.

After receiving the report, Denton contacted Kristen Guinn of Belks Loss Prevention. Denton told Guinn that Customer had reported seeing some young kids in a black SUV in the parking lot, and that one of the occupants was waving a gun. Guinn then contacted Kenneth Lee Harless of Mall Security. Guinn advised Harless that a customer had reported seeing a dark colored SUV in the parking lot and that one of the occupants of the dark colored SUV was waving a gun. At the time, Harless was driving a vehicle marked "Public Safety" in the Mall parking lot.

Harless contacted Marsha Hammond, the Mall Marketing Director, and advised her that Belks Loss Prevention had seen someone with a gun in a black SUV in the parking lot outside the Belks Women's Store. At 7:56 p.m. Hammond called 911, identified herself to the 911 operator, and said that a member of Belks Loss Prevention had observed someone in a black SUV waving a gun in the Mall parking lot outside the Belks Women's Store. Hammond informed the 911 operator that the vehicle was heading from the Belks Women's Store towards Ruby Tuesday at the front of the Mall. Hammond stated that a member of Belks Loss Prevention had personally seen the gun.

At 7:58 p.m. Dispatch announced over the police radio that there was a complaint of a man in a black SUV in the Mall parking lot waving a gun. Dispatch reported that the vehicle was seen at the rear of the Mall and was driving past JC Penney towards the front of the Mall. Dougherty heard the report and asked if the driver was a black male. Dispatch did not know the ethnicity of the suspect and said that they would find out. Rice, Sipos, Church, and Dunn had just finished eating dinner at Wok & Hibachi, located approximately a mile and a half away from the Mall, and heard the radio report and Dougherty's inquiry. Rice said that he was en route.

After making the initial radio announcement, Dispatch asked a 911 operator to contact Hammond to determine the ethnicity of the suspect. A 911 operator called Hammond at 7:58 p.m., and the two spoke for several minutes. Hammond initially did not know the ethnicity of the driver and told the 911 operator that she would find out. At 8:00 p.m. Hammond told the 911 operator that the suspect was a black male on the passenger side of a black Ford SUV, but Hammond did not know the ethnicity of the driver. At 8:01 p.m. Ms Hammond informed the 911 operator that the suspect had left Mall property and was heading towards the movie theater. Hammond asked the 911 operator to continue to hold while Hammond determined whom the police should speak with.

At 8:01 p.m., while the 911 operator was on the phone with Hammond, Dougherty announced over the radio that he had observed a black male, in a black Mercury Mountaineer drive by the theater. Dougherty was working security at the theater, and had seen the same vehicle drive past the theater towards the Mall approximately ten minutes before the initial radio report of the gun sighting. The driver of the Mountaineer had been driving through the theater parking lot slowly, moving his head from side to side as if looking for someone, and Dougherty had been concerned that the driver might be looking for a vehicle to break into. Rice, Sipos, Church, and Dunn heard Dougherty's announcement.

At 8:03 p.m. Rice arrived at the Roane Center parking lot and observed a dark blue Mercury Mountaineer parked near the Electric Cowboy and the Dollar General. Defendant was standing outside the Mountaineer, leaning into the driver's side window of another vehicle, a grey Charger. Defendant was not located in a high crime area. Rice announced over the radio that he was going to observe the vehicle for a minute. In the meantime, Dougherty had begun moving from the theater and announced that Rice was observing the vehicle that Dougherty had seen earlier.

While Rice was arriving at the scene, the 911 operator continued speaking with Hammond. Hammond said that Harless would like to speak with the police and that both Harless and Hammond would be waiting near the entrance to Ruby Tuesday.

Then Defendant and the occupant(s) of the Charger finished their conversation and the Charger drove off in a normal manner. There was nothing unusual or suspicious about the encounter between Defendant and the occupant(s) of the Charger, other than the fact that Defendant was driving a vehicle which matched the description of the vehicle in the gun report. None of the officers observing the encounter suspected they were observing a drug transaction. Defendant returned to his vehicle and began to leave. While Defendant was preparing to leave in his vehicle, Rice drove up behind Defendant, activated his emergency equipment, and stopped Defendant.

The four Investigators exited Rice's vehicle. Rice and Sipos had their guns drawn and Church had his hand on his gun, but the gun was still holstered. Defendant exited his vehicle and Rice performed a quick pat-down of Defendant's waist band. Rice did not detect a gun, but did feel what he thought was a large wad of cash in one of Defendant's front pants pockets. Rice handed Defendant off to Sipos. Sipos handcuffed Defendant for officer safety and performed a quick pat-down of Defendant. Sipos detected nothing unusual in his pat-down. Sipos then stood behind Defendant to secure Defendant while the other officers searched the vehicle.

While Sipos was patting down Defendant, multiple officers searched Defendant's vehicle for a gun. No gun was found. After examining Defendant's vehicle and not finding a gun, Rice returned to Defendant and removed the wad of cash from Defendant's pocket. Rice asked Defendant if Defendant had been at the Mall. Rice also asked Defendant who he was and whether or not he worked. Defendant identified himself and said that he was unemployed. Defendant had

initially been very calm, but grew increasingly nervous and jittery throughout the encounter with the police. Defendant also began to sweat profusely. The amount of Defendant's perspiration was greater than would be explained by the summer heat and was unusually intense.

At this point Rice began to wonder if he had observed a drug transaction between Defendant and the occupant(s) of the Charger. Rice then observed a piece of tissue paper sticking out of one of Defendant's front shirt pockets. Based on his training and experience as a police officer, Rice believed that the tissue paper most likely contained narcotics, but no narcotics were visible to the naked eye, nor had either officer felt anything unusual in their pat-downs of Defendant. Rice removed the tissue from Defendant's pocket, opened the tissue, and found a small piece of cocaine. At that point, Sipos arrested Defendant and performed a search incident to arrest. Sipos discovered a four inch patty of cocaine wrapped in a plastic bag in Defendant's other front shirt pocket.

While the police were investigating Defendant, Harless encountered a black SUV in the Mall parking lot. Harless called 911, although the Investigators had already stopped Defendant at that time, and informed the 911 operator that he had seen the SUV and that he believed that it was the vehicle from the gun complaint. Harless tried to stop the SUV, but was unsuccessful. The SUV seen by Harless was not stopped by the police, was not investigated, and was last seen leaving the Mall and going down Roane Street.

### III.    POSITIONS OF THE PARTIES

Defendant argues that Rice, Sipos, Church, and Dunn had neither probable cause, nor a reasonable and articulable suspicion that Defendant had committed, was committing, or was about to commit a crime, or that Defendant was armed or dangerous prior to stopping Defendant on June

23, 2006. Defendant claims that the police had nothing more than a hunch that Defendant might be committing a crime, and that a hunch is not a sufficient basis for a stop. Therefore, because the police did not have sufficient grounds to stop Defendant, Defendant argues that the evidence obtained as a result of that stop should be suppressed.

The government responds that the stop, detention, and subsequent arrest of Defendant were both lawful and that the evidence and statements obtained incident to the stop, detention, and arrest were lawfully obtained. The government, in its brief [Doc. 19], contends that the Investigators had reasonable suspicion to stop Defendant, because Defendant's vehicle matched the description of the vehicle described in the gun report and because the Investigators observed Defendant and the occupant(s) of the Charger interacting in a suspicious manner. The government, in its brief [Doc. 19], further contends that Rice, during his pat down of Defendant, felt what, based upon his training and experience as a police officer, he knew to be a controlled substance in one of Defendant's shirt pockets, giving him probable cause to seize the tissue wrapped quantity of cocaine.

## IV.   ANALYSIS

### A.   Propriety of the Stop

The first issue the Court must address is whether the Investigators properly stopped Defendant on June 23, 2006. It is the government's contention that the Investigators had reasonable suspicion to stop Defendant based upon the gun report involving a black SUV.

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend. IV. However, a temporary seizure under the Fourth Amendment is not unreasonable for investigative purposes, in what is referred to as a Terry stop, where the officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about

to occur.  <u>Terry v. Ohio</u> 393 U.S. 1, 20 (1968); <u>Farm Labor Org. Comm. v. Ohio State Highway Patrol</u>, 308 F.3d 523, 543-44 (6th Cir. 2002).   Under <u>Terry</u>, the officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions.  <u>United States v. Martin</u>, 289 F.3d 392, 398 (6th Cir. 2002).  If the suspect's answers fail to supply the officer with probable cause to arrest the suspect, then the officer must release the suspect.  <u>Id.</u> at 397.

Defendant argues that the officers' basis for stopping him amounted to a hunch rather than reasonable suspicion and is therefore unlawful.  The Court finds that Defendant was seized when Rice activated his emergency equipment and stopped Defendant.  At that point, the Investigators had to have reasonable suspicion to detain Defendant.  Concluding that a seizure occurred, the Court must now determine, under a totality of the circumstances analysis, whether the seizure was constitutionally permissible.  In other words, the Court must determine whether the officers had a reasonable suspicion, supported by articulable facts, that the defendant was engaged in criminal activity when they seized the defendant.  <u>Terry</u>, 393 U.S. at 20; <u>Farm Labor Org. Comm.</u>, 308 F.3d at 543-44.  In evaluating the constitutionality of an investigative stop, the Court engages in a two-part analysis of the reasonableness of the stop.  First, the Court asks, "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion" of criminal activity.  <u>United States v. Garza</u>, 10 F.3d 1241, 1245 (6th Cir. 1993).

The government contends that the Investigators had reasonable suspicion to seize Defendant based upon the fact that Defendant was driving a vehicle which matched the description of the vehicle involved in the gun report.  Defendant contends that the officers' observations

29

amounted to no more than a hunch because the officers did not actually see Defendant commit any crimes, they merely saw Defendant standing in a public area, doing nothing that would provide a basis for reasonable suspicion.

Initially, the Court notes that facts innocent in and of themselves can contribute to reasonable suspicion. See United States v. Arvizu, 534 U.S. 266, 273 (2002) (holding that seemingly innocent information can provide a basis for reasonable suspicion in light of an officer's training and experience). Furthermore, even if the isolated facts and circumstances in this case could arguably be deemed innocent, the Court does not view them in isolation. United States v. Garza, 10 F.3d 1241, 1245 (6th Cir. 1993). Instead, when reviewing a challenge to an investigative stop, the Court assesses the reasonableness of the officer's suspicion that criminal activity "may be afoot" in light of the totality of the circumstances, giving due weight to specific reasonable inferences which officers are entitled to draw from the facts. United States v. Bailey, 302 F.3d 652, 658 (6th Cir. 2002); see also United States v. Jones, 75 Fed.Appx. 334, 337-38 (6th Cir. 2003) (holding that "[o]fficers are permitted to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person"). The likelihood of criminal activity "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Zabawa, 134 Fed. Appx. 60, 62 (6th Cir. 2005) (quoting Arvizu, 534 U.S. at 273). In other words, there must be a "minimal level of objective justification" for making the stop. United States v. Moreno, 43 Fed.Appx. 760, 764 (6th Cir. 2002).

Furthermore, the Court notes that, "[p]articularly in the context of felonies or crimes involving a threat to public safety, it is in the public interest that the crime be solved and the suspect

detained as promptly as possible." United States v. Hensley, 469 U.S. 211, 229 (1985). Nevertheless, officers must still possess reasonable suspicion that the person stopped is the person who perpetrated the crime endangering the public. See Florida v. J.L., 529 U.S. 266 (2000) (holding that the police may not stop a person based upon an anonymous tip of illegal possession of a firearm absent corroboration of predictive behavior). However, when a complainant identifies himself, and the police are able to contact the complainant to confirm a complaint, then the complainant merits a higher level of trustworthiness. See United States v. Howard, 150 Fed. Appx. 476, 479-80 (6th Cir. 2005).

Additionally, the Sixth Circuit has affirmed a finding of reasonable suspicion when a vehicle was stopped at a location consistent in timing and direction with a vehicle reported to have fled a crime scene. See United States v. Hurst, 228 F.3d 751, 757 (6th Cir. 2000). In holding that the officer had reasonable suspicion to stop the defendant, the Hurst court observed that the defendant's car "roughly match[ed]" the description given by the victim in color and style as well as matching a second, more distinctive description subsequently given by an off-duty officer. Id. at 757. It also emphasized that the car was traveling in the reported direction and was spotted "at a location consistent with the time needed to travel to that point from the [burglary victim's] residence." Id. The court held that a discrepancy in the number of people in the car (three rather than two) could reasonably be explained in numerous ways and did not negate the officer's reasonable suspicion. Id.; see also United States v. Long, No. 05-5692, 2006 U.S. App. LEXIS 24584, at *10-14 (6th Cir. Oct. 2, 2006) (holding that sufficient reasonable suspicion to justify the stop of a vehicle was present where information in the dispatch call matched observations by the officer in the field).

Thus, the Court finds, giving due weight to the experience and specialized training of Rice, Sipos, Church, and Dunn, and Dougherty, that (1) the officers involved in the stop believed that a Belks security guard had observed someone in a black SUV waving a gun; (2) the report of a gun was made by Hammond, an identified source whom the police were able to contact to confirm further details of the report; (3) Hammond said that the suspect had left Mall property and was last seen heading towards the movie theater; (4)Defendant was driving a vehicle that matched the description of the vehicle involved in the gun report; (4) Dougherty observed Defendant driving toward the Mall approximately ten minutes before the gun report; (5) Dougherty, based upon his experience and training as a police officer, found Defendant's behavior suspicious, as if Defendant might be looking for vehicles around the theater to break into; (6) Dougherty observed Defendant driving from the direction of the Mall immediately after the gun report; (7) Harless's report that he had seen a black Rodeo which he believed to be the vehicle from the gun report occurred after the Investigators had already stopped Defendant; and (8) it was reasonable for Rice, Sipos, Church, and Dunn and Dougherty to believe that Defendant might be driving the vehicle involved in the gun report. Based on the foregoing, the Court finds that the Investigators had reasonable suspicion to believe that Defendant was driving the vehicle involved in the gun report and that criminal activity was afoot. More specifically, the Court finds that Defendant's suspicious behavior, coupled with Defendant's proximity in both time and place to the Mall, and the fact that Defendant's vehicle matched the description of the vehicle involved in the gun report provided the requisite reasonable suspicion for the officers to conduct a Terry investigation.

Accordingly, the Court finds based on the totality of the circumstances, including the information known to the officers as set forth above along with reasonable inferences that could be

drawn from the cumulative information available to them at the time of the stop, that the officers had reasonable, objective suspicion to conduct a <u>Terry</u> investigation. Thus, Defendant's seizure was constitutionally permissible.

## B.     Propriety of the Detention and Frisk

Having concluded that the basis for the investigative stop was proper, the Court must next determine whether the detention was reasonable, that is, (1) was it sufficiently time limited, and (2) were the investigative means used the least intrusive means reasonably available." <u>Bennett v. City of Eastpointe</u>, 410 F.3d 810, 825-26 (6th Cir. 2005) (internal quotation marks and citation omitted). Defendant contends that the Investigators did not have the requisite reasonable suspicion to frisk Defendant and search his car. He argues that the Investigators' suspicion that Defendant might be driving the vehicle described in the gun report did not support that degree of intrusion. The government contends that the Investigators had specific and articulable facts causing them to believe Defendant could be armed and dangerous and that handcuffing Defendant and conducting a frisk was warranted.

When an individual is subject to a lawful investigative detention, an officer may conduct a limited frisk or pat-down of that person for weapons if the officer has reasonable suspicion of criminal activity and a reasonable belief that the suspect he is investigating at close range is armed and dangerous. <u>Terry</u>, 392 U.S. at 26-27; <u>United States v. Walker</u>, 181 F.3d 774, 778 (6th Cir. 1999). "[T]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [officer under] the circumstances would be warranted in the belief that his safety and that of others was in danger." <u>Terry</u>, 392 U.S. at 27; <u>see</u> <u>also</u> <u>United States v. Thomas</u>, No. 04-5872, 2005 WL 1869676, *2 (6th Cir. Aug. 3, 2005). In other words, "[t]he

purpose of the search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence." United States v. Vite-Espinoza, 342 F.3d 462, 466 (6th Cir. 2003). In determining whether an officer's suspicion of danger and subsequent conduct are reasonable, "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch' but to specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Terry, 392 U.S. at 27.

Furthermore, if an officer has a reasonable belief that a suspect is dangerous, the officer may order the suspect to get out of the car and may detain the suspect at gunpoint during an investigatory stop. See United State v. Hardnett, 804 F.2d 353, 357 (6th Cir. 1986) (holding that officers were justified in blocking the defendant's car, approaching with guns drawn, and ordering the occupants out of the car as part of a Terry stop based upon a tip that the occupants were armed). "This Circuit permits the use of force, such as handcuffs and guns, to effect a stop when such a show of force is reasonable under the circumstances of the stop." United States v. Heath, 259 F.3d 522, 530 (6th Cir. 2001).

In the instant case, the Investigators were responding to a complaint involving a gun. The timing, location, and description of Defendant's vehicle matched the description of the suspect vehicle in the gun complaint. Based on this information, the Court finds that the Investigators possessed an articulable and objectively reasonable belief that Defendant was potentially dangerous, making the Investigators' display of arms and use of handcuffs reasonably necessary.

Having found that the Investigators possessed a reasonable belief that Defendant was dangerous and that the Investigators' safety was at risk, the Court also finds that the Investigators were "entitled to take steps to ensure that [Defendant was] not armed" and could properly frisk

Defendant for weapons.  See Terry, 392 U.S. at 27 (holding that an officer may frisk a suspect for weapons as a part of an investigatory detention if the officer reasonably believes that his safety is at risk).  The Court finds that the Investigators, having reasonable grounds to believe that Defendant was armed and dangerous, performed a restricted search for any weapon that could be used against them.  However, the Court also finds that the frisk did not reveal any incriminating evidence and that, while performing the frisk, the Investigators did not detect the presence of the two quantities of cocaine in Defendant's shirt pockets.

## C.      Propriety of the Automobile Search

Having found that the Investigators could have reasonably believed that Defendant was potentially armed and dangerous, and that the frisk of Defendant was therefore proper, the Court now turns to the propriety of the automobile search.  Defendant argues that it was unlawful for the officers to search his vehicle.  The government contends that the search of Defendant's vehicle was permissible.

The rationale of Terry has been extended to permit limited searches of a vehicle's passenger compartment when a police officer possesses a reasonable belief based upon "specific or articulable facts, which taken with rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and that the suspect may gain immediate control of weapons.  Michigan v. Long, 463 U.S. 1032, 1049 (1983).  The scope of the protective search may include those areas in a which a weapon may be placed or hidden.  Long, 463 U.S. at 1049.  The Supreme Court has recognized that a suspect may break away from police control and retrieve a weapon from his vehicle.  Id. at 1051; see also United States v. Paulino, 935 F.2d 739, 747 (6th

Cir. 1991) (holding that six police officers on scene separating suspect from cooler possibly containing weapons did not obviate the need for protective search of vehicle).

Furthermore, an officer may also anticipate allowing the suspect to reenter the vehicle after the stop, at which time the suspect may retrieve any hidden weapons.  Long, 463 U.S. at 1051-52.  Moreover, the Sixth Circuit has held that "[t]he 'pat-down' of a vehicle need not be predicated on the discovery of a weapon on a suspect's person."  United States v. Slater, No. 95-5223, 1996 U.S. App. LEXIS 10095 , at *8 (6th Cir. Mar. 26, 1996) (citing United States v. Holifield, 956 F.2d 665, 668-69 (7th Cir. 1992)).

The Court finds that the same factors that justified the initial pat-down of Defendant supplied reasonable belief that Defendant was potentially armed and dangerous and justified the Investigators' search of the interior of Defendant's vehicle to ensure the officers' safety.  The fact that  Defendant was standing by Rice's vehicle, and that he was under the control of Sipos, does not detract from the fact that Defendant may have been able to access a weapon in his vehicle.  Because Defendant would have been permitted to reenter his vehicle if he had not been arrested, and would have had immediate access to any weapons inside, the Court finds that it was reasonable for the officers to check the passenger compartment of Defendant's vehicle for weapons even though a pat-down revealed none on his person.  The Court also finds that the search of the vehicle revealed no incriminating evidence.

**D.**     **Propriety of the Seizure of the Cash**

Having found that the Terry stop and pat-down of Defendant and the search of Defendant's vehicle were proper, the Court now turns to the propriety of the seizure from

Defendant's pants pocket of the "wad of cash."[18]  Defendant argues that the seizure was unlawful. The government contends that the seizure was justified.

The Court found above that Rice detected the "wad of cash" while performing a permissible pat-down of Defendant. Therefore, any seizure of the "wad of cash" must be justified under the plain touch doctrine.  Under the plain touch doctrine, an officer may seize contraband detected during a protective pat-down search authorized by Terry if the object's identity is "immediately apparent" to the officer's touch.  Minnesota v. Dickerson, 508 U.S. 366, 375 (1993). In order to seize evidence under the plain touch doctrine, the officer must have probable cause to believe the item in plain touch is incriminating evidence. Id. at 376.  To give rise to probable cause, the item must be immediately identifiable, an item "whose contour or mass makes its identity immediately apparent."  Id.

The Court notes that other courts have permitted the seizure of cash detected by plain touch during a protective Terry pat down.  See United States v. Bustos-Terres, 396 F.3d 935, 945 (8th Cir. 2005) (holding that the seizure of cash detected by plain touch during a Terry pat down of a defendant in a drug investigation was constitutionally permissible); United States v. Hernandez-Rivas, 348 F.3d 595, 599 (7th Cir. 2003) (holding that the seizure of cash detected both by plain touch and plain view during a Terry pat down of a defendant in a drug investigation was constitutionally permissible).  However, the Court also notes that the cases allowing the seizure of cash under the plain touch doctrine involved drug investigations, and that the seizure of the cash was permissible because the investigating officers had probable cause to believe that the cash discovered

---

[18]The Court notes that the record contains no evidence as to exactly how much cash was seized from Defendant's pants pocket.

was evidence of a drug transaction. <u>Bustos-Terres</u>, 396 F.3d at 945; <u>Hernandez-Rivas</u>, 348 F.3d at 599.

The Court finds that Rice did not have probable cause to believe that the "wad of cash" Rice detected by plain touch in Defendant's pants pocket was incriminating evidence. The Court found above that Rice did not begin to suspect that Defendant was involved in a drug transaction until after Rice seized the cash. The Court also found that, prior to the seizure of the cash, Rice was investigating Defendant in response to the report of a gun, not a drug crime. The Court notes that all four Investigators testified that, upon observing the interaction between Defendant and the occupant(s) of the Charger, the only thing unusual about the encounter was that Defendant's vehicle matched the vehicle described in the gun report.

Given that none of the Investigators believed they were investigating a drug crime prior to Rice's seizure of the cash, there was no reason for Rice to believe that the "wad of cash" might constitute incriminating evidence in relation to the report of a gun. Without the requisite probable cause, Rice could not seize the "wad of cash" under the plain touch doctrine, and the Court must recommend that the "wad of cash" be suppressed.

**E.      Propriety of the Seizure of the Tissue**

Having found that the <u>Terry</u> stop and pat-down of Defendant and the search of Defendant's vehicle were proper, and that the seizure of the "wad of cash" was improper, the Court now turns to the propriety of the seizure from Defendant's shirt pocket of the tissue containing cocaine. Defendant argues that the seizure was unlawful. The government contends that the seizure was justified.

The Court found above that the Investigators did not detect the presence of either quantity of cocaine in Defendant's shirt pockets when they performed the pat-down of Defendant. Since the Investigators did not detect the cocaine through the permissible pat-down and did not have a search warrant, the only other possible exception to the Fourth Amendment protection against illegal searches and seizures which would justify the search and seizure is the plain view doctrine.

To seize evidence in plain view without a warrant, the evidence must be "(1) in plain view; (2) of a character that is immediately incriminating; (3) viewed by an officer lawfully located in a place from where the object can be seen; and (4) seized by an officer who has a lawful right of access to the object itself." United States v. Roark, 36 F.3d 14, 18 (6th Cir. 1994). The Court finds that the tissue was in plain view, therefore the Court must determine whether the tissue was immediately incriminating.

The "immediately incriminating" standard "does not demand an 'unduly high degree of certainty;' rather, a plain view seizure is 'presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.'" United States v. Calloway, 116 F.3d 1129, 1133 (6th Cir. 1997) (quoting Texas v. Brown, 460 U.S. 730, 741-42 (1983)). The doctrine requires only that an officer have probable cause in its ordinary sense before seizing an incriminating item. Minnesota v. Dickerson, 508 U.S. 366, 376 (1993). The burden of proving the propriety of a warrantless seizure is on the government. United States v. Beal, 810 F.2d 574, 577 (6th Cir. 1987).

In order to rule in favor of the government, the Court would have to find that the piece of tissue sticking out of Defendant's pocket was immediately incriminating under all of the circumstances. Rice stated that, based upon his experience and training, he knew that narcotics are

often wrapped in pieces of tissue paper. While Rice conceded that Defendant could have had the tissue in his pocket for an innocent reason, Rice stressed that Defendant exhibited several signs of participating in narcotics dealing: Defendant had no employment, but Defendant had a large amount of cash and was driving a recently purchased, although not "new," vehicle; Defendant was nervous and his mood and appearance became more suspicious as he was questioned; and Defendant sweated profusely and was agitated. The Court finds the testimony of Rice, as well as the testimony of the other officers, to be credible. However, given this Court's recommendation that the cash be suppressed, the Court can not consider the cash when determining whether Rice had probable cause to simply remove the plainly visible tissue and expose its contents. In the absence of the cash, the Court can not find that Rice under all of the circumstances, had probable cause to seize the tissue.

Instead, the Court finds that the piece of tissue sticking out of Defendant's pocket was not immediately incriminating. The Court notes that the Sixth Circuit has held that "when an item appears suspicious to an officer but further investigation is required to establish probable cause as to its association with criminal activity, the item is not immediately incriminating." United States v. McLevain, 310 F.3d 434, 443 (6th Cir. 2002) (quoting United States v. Byrd, No. 98-2275, 2000 U.S. App. LEXIS 7284, at *7 (6th Cir. Apr. 18, 2000)). By itself, without some further sign that the tissue was being used to conceal narcotics, a tissue is not immediately incriminating.[19] The only way Investigator Rice could determine if the tissue contained narcotics was to remove the tissue from Defendant's pocket and examine its contents, which is what Investigator Rice did. By

---

[19]The Court notes that Defendant had already been frisked in some manner by at least two officers, Investigators Rice and Sipos, but neither officer detected anything incriminating. This fact further supports the Courts finding that the tissue was not immediately incriminating.

removing the tissue and inspecting its contents, Investigator Rice engaged in the "further investigation" specifically proscribed by McLevain. See id.

The Court finds that the government has not met its burden in proving that the warrantless search and seizure of the contents of Defendant's shirt pocket, namely the tissue, was lawful. Therefore, the Court finds that Investigator Rice's action in removing the tissue from Defendant's pocket constituted an impermissible search and seizure in violation of the Fourth Amendment. Based upon that finding, the Court recommends that the quantity of cocaine base found in the tissue be suppressed. Furthermore, the Court recommends that the second quantity of cocaine base and any statements made by Defendant subsequent to the unlawful search and seizure should also be suppressed under the fruit of the poisonous tree doctrine.

## V.    CONCLUSION

After carefully considering the evidence introduced during the course of the
evidentiary hearing, and after reviewing the relevant legal authorities, it is clear that all evidence
seized in this case and all statements made by Defendant subsequent to the unlawful search and
seizure should be suppressed.  For the reasons set forth herein, it is **RECOMMENDED** that
Defendant's Motion to Suppress [Doc. 18] be **GRANTED**.[20]

Respectfully submitted,

_____s/ H. Bruce Guyton_____
United States Magistrate Judge

_____

[20]Any objections to this report and recommendation must be served and filed within ten
(10) days after service of a copy of this recommended disposition on the objecting party.  Fed. R.
Crim. P. 59(b)(2).  Failure to file objections within the time specified waives the right to review
by the District Court.  Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985)
(providing that failure to file objections in compliance with the ten-day time period waives the
right to appeal the District Court's order).  The District Court need not provide de novo review
where objections to this report and recommendation are frivolous, conclusive, or general.  Mira
v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for
appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).

Appendix A

Summary of Relevant 911 Calls and Police Radio Communications
on Defense Exhibit 3

The recording at time stamp 19:56:40 is of the first telephone conversation between a 911 operator and Hammond. Hammond identified herself as "Marsha calling from the Mall in Johnson City" and said that a black SUV was waving a gun in the Mall parking lot, somewhere between lot 3 and lot 5, and was heading towards Ruby Tuesday. Hammond stated that the vehicle was at the back of the Mall, by the Belks Women's Store, heading past JC Penney towards Entrance A at the front of the Mall. Hammond stated that the report came from Belks Loss Prevention and that a Mall security officer was en route to Entrance A.

The recording at time stamp 19:57:47 appears to be a continuation of the first telephone conversation between a 911 operator and Hammond. Hammond reiterated that the vehicle came from Belks and was heading toward Ruby Tuesday. Hammond stated that the driver of the vehicle was waving a gun, and that Belks Loss Prevention actually saw the gun.

The recording at time stamp 19:58:19 is of radio traffic between Dispatch and various police officers, including Rice and Dougherty. Dispatch advised that there has been a report of the driver of a black SUV waving a gun in the Mall parking lot driving towards the front of the Mall on the JC Penney side. Dougherty asked if the driver is a black male, but Dispatch said that they would have to check.

The recording at time stamp 19:58:35 appears to be radio traffic from Dispatch indicating that the suspect was seen near JC Penney driving toward Ruby Tuesday.

The recording at time stamp 19:58:46 appears to be a second telephone conversation between Hammond and a 911 operator. Hammond identified herself as a Marsha

Hammond, the Mall's Marketing Director. Hammond stated that she did not know whether the driver was a black male or while male, but that she would find out.

The recording at time stamp 20:00:17 appears to be a continuation of the second telephone conversation between Hammond and a 911 operator. Hammond said that the person waving a gun was a black male on the passenger side of a black Ford SUV. Hammond stated that Mall security officers were en route to try to find the suspects.

The recording at time stamp 20:00:49 appears to be radio traffic from one unidentified police officer attempting to contact another unidentified police officer.

The recording at time stamp 20:01:24 appears to be a continuation of the second telephone conversation between Hammond and a 911 operator. Hammond said that the suspects had left the Mall property, and were possibly heading towards the movie theater. Hammond stated that there were two people in the vehicle and that she did not know whether the driver was a black male or white male.

The recording at time stamp 20:01:40 is of police radio traffic between Dispatch and various police officers. Dougherty informs Dispatch that he had observed a black male in a black SUV, a Mercury Mountaineer with no tag visible, drive by the theater right after the initial radio announcement of the complaint. Various other officers said that they were en route.

The recording at time stamp 20:03:19 appears to be a continuation of the second telephone conversation between Hammond and a 911 operator. Hammond said that Harless would like to speak to the police about the report and that both Harless and Hammond will be near the entrance to Ruby Tuesday waiting for the police.

The recording at time stamp 20:03:41 is of police radio traffic between Dispatch, Rice, and Dougherty. In the recording, Rice said that he saw a dark blue Mercury Mountaineer near the Electric Cowboy and that a black male was outside of the vehicle talking. Rice said he was going to watch for a minute. Dougherty then said that he could see Defendant getting back in his vehicle and confirmed that was the vehicle Dougherty had spotted earlier. Dougherty said that he had not seen anything suspicious, but had heard the report on the radio and seen the vehicle drive by the theater.

The recording at time stamp 20:06:04 is of a telephone conversation between Harless and a 911 operator. Harless identified himself as Mall Security and said that he believed he had spotted the vehicle from the gun report. Harless identified the vehicle as a black Rodeo SUV, stated its license plate number, and noted that the vehicle had turned onto Roane Street. Harless stated that the vehicle contained two white males and one white female and said that the female kept watching him while he was behind them and that the front passenger was reaching under the seat.

The recording at time stamp 20:06:35 is of police radio traffic between an unidentified Officer, possibly Rice, and Dispatch. The officer announces that there is a "Code Four at the Roane Center," but there is no evidence in the record as to what a "Code Four" is.

The recording at time stamp 20:07:24 is police radio traffic between Rice and Dispatch. Rice asks whether the complainant wanted to "Signal Eight." Dispatch advised that Harless would be waiting at the Mall and that the officers could "Signal Eight" with him. There is no evidence in the record as to what a Signal Eight is.

The recording at time stamp 20:08:00 is police radio traffic between Rice and Dispatch. Rice asked Dispatch if they had the complainant on the phone. Dispatch said that it did not know if the complainant was still on the phone, but did provide Rice with Hammond's cell phone number.

The recording at time stamp 20:08:11 is a continuation of the telephone conversation between Harless and a 911 operator. Harless said he believed this was the vehicle from the initial gun report, because it had come from the same area in the gun report and fit the description.

The recording at time stamp 20:12:33 is of police radio traffic between Dispatch and an unidentified police officer. Dispatcher advised the officer that there had been a sighting of a black Rodeo SUV by Mall Security and that the SUV might be the one from the original gun report. The Rodeo was last seen going towards Roane Street and contained two white males and one white female.

The recording at time stamp 21:01:05 is of police radio traffic between Dispatch and Rice. Rice said that he would be following the wrecker towing away Defendant's vehicle.